NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| ROSA TAMAYO, | : |
| Plaintiff, | : **OPINION** |
| v. | : Civ. No. 05-3364 (WHW) |
| DELOITTE & TOUCHE, LLP, | : |
| Defendant. | : |

**Walls, Senior District Judge**

Plaintiff Rosa Tamayo brings this action under the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 et seq., and the New Jersey Family Leave Act ("NJFLA"), N.J.S.A 34:11B, alleging that her former employer, Deloitte Services, LP[1], wrongfully terminated her in violation her right to take job-protected leave to care for her dying mother.

Both parties now move for summary judgment. Pursuant to Rule 78 of the Federal Rules of Civil Procedure, the Court decides this matter on the basis of the written submissions of the parties. The Court denies Plaintiff's and Defendant's motions.

**FACTUAL BACKGROUND**

---

[1]Defendant was improperly pleaded as "Deloite & Touche, LLP."

-1-

**NOT FOR PUBLICATION**

Plaintiff Rosa Tamayo ("Tamayo") began her employment with Deloitte & Touche, LLP on April 5, 1999 as a member of the Research and Analysis ("R&A") group in Jersey City, New Jersey. On December 31, 2000, Tamayo and the rest of the R&A group were transferred to Defendant Deloitte Services, LP ("Deloitte Services"). Deloitte Services is a financial consulting firm which employs more than fifty employees in Jersey City. Throughout her tenure with Deloitte Services, Tamayo reported directly to Peter Firth, who reported directly to Paul Cahn, the director responsible for the R&A group.

The parties agree that Tamayo's work performance was acceptable for the first few years of employment. In her July 8, 2002 evaluation, Tamayo received a rating of "good" or "very good" in seventeen out of eighteen categories of evaluation and an overall rating of "good." At some point in 2002, Tamayo began working from home several days a week. The parties dispute the nature of this arrangement. Plaintiff characterizes it as a "flexible work schedule" approved by Firth. In contrast, Defendant contends that the arrangement never received formal approval and that Firth disapproved of Tamayo's new schedule. In March 2003, Firth met with his supervisor, Cahn, and Human Resources (HR) representative Laura Avalos to discuss concerns regarding Tamayo's work schedule and her attendance in the Jersey City office. These concerns led to Tamayo being placed on a Performance Improvement Plan ("PIP") on April 1, 2003.

The PIP states that it was intended to "address the issue of work location and work hours." It states that Tamayo had adopted a "personal flexible arrangement that is not in sync with the ultimate goals of the R&A team." The PIP lists three goals going forward:

> 1) Effective immediately, you are expected to work on site at your assigned work location (currently the Jersey City Offices) Mondays through Fridays during

**NOT FOR PUBLICATION**

> normal business hours (the standard 8 working hours), within our office hours of 8:00 a.m. - 6:00 p.m.  As an exempt employee, the expectation is that you will work overtime as necessary.
>
> 2) You will no longer be permitted to work from home.  Your flexible arrangement has resulted in a perception by clients, as well as management and myself, that you are "never around."
>
> 3) Unplanned changes in work schedule will not be permitted and will be limited to only extreme emergency situations.

The parties dispute the meaning of the PIP.  Tamayo asserts that the PIP solely addresses the issue of work location and does not encompass attendance.  She notes that Firth stated at the meeting with Cahn and Avalos that he was confident that Tamayo was working forty hours a week based on her completion of assignments.  In contrast, Defendant maintains that work location and attendance are not distinct and that the PIP encompassed both.

In April, Tamayo began to work on site during regular business hours, as directed.  She missed several days due to her own illness, but provided a doctor's note and was excused for this absence.  However, the parties dispute whether Tamayo lived up to the expectations of the PIP between May and July.  According to Defendant, Tamayo arrived midday on both May 7 and 8.  Tamayo denies this allegation.  She maintains that although the first swipe of her security card at the Jersey City office on those days was 11:26 a.m. and 12:04 respectively, employees frequently enter the offices without swiping their cards by tailing other employees.  On May 9, Tamayo contacted Firth to request a personal day due to the death of her long-time boyfriend's brother.  The parties agree that Tamayo took the day off on May 19 to attend the funeral and wake but dispute whether she gave Firth a week's notice or called last minute.  Defendant maintains that

**NOT FOR PUBLICATION**

Tamayo was also out of the office May 20 and then again on May 22 and 23 because she went to North Carolina after her boyfriend's brother's apartment was burglarized. Tamayo admits that she traveled to North Carolina to clean out the apartment following the burglary, but denies she missed any work as a result.

On the evening of Monday, May 26, 2003, Tamayo learned that her mother had been rushed to the hospital. According to Tamayo, she spoke with Firth by phone on May 27 and informed him that she would need to take time off to care for her mother. Firth allegedly told her to do what she had to do. Plaintiff's mother remained in the hospital for a week. After she was released, she required on-going medical treatment, including visits with her primary care physician, an oncologist, and a hemotologist. She also underwent weekly blood transfusions, ultrasounds, and a colonoscopy. Ultimately, her symptoms were diagnosed as myelodysplaia, a form of leukemia.

The parties agree that Tamayo's attendance in June was sporadic. However, Tamayo attributes all of her absences to caring for her mother whereas Defendant maintains that Tamayo was also late and absent for non-health related reasons such as traffic and car problems. In July, Defendant alleges that Tamyo came in late or missed a number of days of work that were not related to her mother's illness. In particular, Defendant claims that Tamayo came in late or not at all on July 3 and that she was out on July 7 without excuse. Similarly, Defendant maintains that on July 8, Tamayo called Firth at 10:30 a.m. to report that she was on her way back from the hospital, but failed to come into the office. On July 11, Tamayo allegedly left Firth a voicemail indicating that she would not make it into the office as a result of computer problems, and on

**NOT FOR PUBLICATION**

July 14 she allegedly left Firth a voicemail that she was taking the day off because there had been a train derailment on the New Jersey Transit Northeast Corridor line and she was worried that her boyfriend may have been on the train. Defendant claims that on July 15, Tamayo called last minute to say she was taking a personal day to go to the dentist. Finally, Defendant states that Firth received a message on July 29 that Tamayo would be working from home due to a fever.

      Tamayo, in contrast, disagrees with Defendant's characterization of her July attendance. According to Tamayo, card swipe records indicate that she was in the office on July 3. She acknowledges that she missed work on July 7 and 8, but states that the purpose was to care for her mother. Tamayo admits that she missed work on July 11 and 14. Although she does not specifically remember the reason, given the timing, she assumes it was to take care of her mother. Finally, Tamayo agrees that she missed work on July 15 to go to the dentist, but maintains that she gave Firth notice.

      At some point in June or July 2003, HR discovered that Tamayo had been improperly completing her time records by regularly entering full eight-hour days for many days in which she had come into work late or not at all. At HR's request, Firth compiled information about Tamayo's attendance in order to confirm that she had been entering her time falsely. Cahn sent a July 8, 2003 memo which bulleted Tamayo's recent absences. Firth created a "Time and Attendance" chart which documented Tamayo's attendance from April 1, 2003 to July 18, 2003. Although the chart listed some of the proffered reasons for Tamayo's absences, it did not specifically document which absences were protected by the FMLA.

      On July 31, Cahn held an in-person meeting with Tamayo and Karen Richter, the HR

**NOT FOR PUBLICATION**

representative responsible for the R&A group, to discuss Tamayo's attendance since the PIP and her time records. With regard to attendance, Tamayo explained that the reason for many of her absences was to take care of her mother who had been diagnosed with leukemia. According to Tamayo, Richer told her that she was "using [her] mother as an excuse" for her absences. Tamayo Dep. at 58-59. Richter does not recall making such a statement. Tamayo informed Cahn and Richter that she would need additional time off work to accompany her mother to biweekly blood transfusion procedures. Richter suggested that Tamayo contact the Personal Services Network ("PSN") to explore her options under the FMLA. This was the first time that anyone from Deloitte Services had indicated to Tamayo that she may be elligible for FMLA leave.

At the meeting, Tamayo acknowledged that she had falsely reported eight hours of work for days she had not worked but explained that she had gotten behind on her time reports and was "just filling them out so [she] could get them done." She indicated that she intended to go back and correct the reports later. Tamayo Dep. at 116-17, 150. Richter and Cahn asked Tamayo to reconstruct her reports to better reflect the days that she had been working.

After excusing Tamayo from the meeting, Cahn and Richter made the decision to terminate Tamayo. Cahn testified that the decision was based on the fact that Tamayo had not lived up to her PIP and because she had falsified her time reports. Tamayo was not informed that she had been terminated until August 7, 2003. In the interim, she had contacted PSN to inquire about taking FMLA leave.

**PROCEDURAL HISTORY**

**NOT FOR PUBLICATION**

On June 29, 2005, Tamayo filed a complaint against Deloitte Services in the District of New Jersey, alleging a violation of the FMLA, 29 U.S.C. § 2601 et seq., and the NJFLA, N.J.S.A 34:11B.  On June 30, 2006, Defendant made a motion for summary judgment.  On July 5, 2006, Plaintiff also moved for summary judgment.

**STANDARD FOR SUMMARY JUDGMENT**

Summary judgment is appropriate where the moving party establishes that "there is no genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  A factual dispute between the parties will not defeat a motion for summary judgment unless it is both genuine and material.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  A factual dispute is genuine if a reasonable jury could return a verdict for the non-movant and it is material if, under the substantive law, it would affect the outcome of the suit.  See id. at 248.  The moving party must show that if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the non-moving party to carry its burden of proof.  See Celotex v. Catrett, 477 U.S. 317, 318 (1986).

Once the moving party has carried its burden under Rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts in question." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  To survive a motion for summary judgment, a non-movant must present more than a mere scintilla of evidence in his favor.  Woloszyn v. County of Lawrence, 396 F.3d 314, 319 (3d Cir. 2005).  The opposing party must set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations or denials of its pleadings.  Shields v. Zuccarini, 254 F.3d 476, 481 (3d

**NOT FOR PUBLICATION**

Cir. 2001). The material fact or facts become genuine when a reasonable trier of fact could render a verdict for the non-moving party. Healey v. New York Life Ins. Co., 860 F.2d 1209, 1219 n.3 (3d Cir. 1988), cert. denied, 490 U.S. 1098 S.Ct. 2449 (1989).

At the summary judgment stage the court's function is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue for trial. See Anderson, 477 U.S. at 249. In doing so, the court must construe the facts and inferences in the light most favorable to the non-moving party. Curley v. Klem, 298 F.3d 271, 277 (3d Cir. 2002).

**DISCUSSION**

   **1. Family Medical Leave Act (Count 1)**

The stated purpose of the FMLA is to "balance the demands of the workplace with the needs of families" and "to entitle employees to take reasonable leave for medical reasons." 29 U.S.C. § 2601(b)(1), (2). The FMLA seeks to accomplish these purposes "in a manner that accommodates the legitimate interests of employers." 29 U.S.C. § 2601(b)(3). The FMLA creates a series of substantive rights, often referred to as "entitlement" or "interference" provisions. See Callison v. City of Philadelphia, 430 F.3d 117, 119 (3d Cir. 2005). An eligible employee "shall be entitled to a total of twelve workweeks of leave during any twelve month period" because of a serious health condition, a need to care for a close family member with a serious health condition, or a birth, adoption or placement in foster care of a child. 29 U.S.C. § 2612(a)(1). Following a qualified absence, the employee is entitled to be reinstated to her former position or to an alternative one with equivalent pay, benefits, and working conditions. 29

**NOT FOR PUBLICATION**

U.S.C. § 2614(a)(1).

The FMLA also provides protection against discrimination based on the exercise of these rights, often referred to as "discrimination" or "retaliation" provisions.  See 29 U.S.C. §2615(a)(1), (2); 29 C.F.R. § 825.220(c) ("An employer is prohibited from discriminating against employees who have used FMLA leave.").  See also Callison, 430 F.3d at 119 (explaining that the FMLA contains distinct entitlement/interference and discrimination/retaliation provisions).

The parties dispute whether Tamayo's claim is an interference or a discrimination/retaliation claim.  Plaintiff argues that Defendant used Plaintiff's FLMA protected absences as a "negative favor" in reaching its decision to terminate her, and therefore interfered with her entitlement to FMLA leave.  In contrast, Defendant argues that Tamayo's claim is properly characterized as a retaliation claim and should be analyzed under the McDonnell Douglas burden shifting framework.  See McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) (setting forth the burden shifting analysis to be used in Title VII discrimination cases).

      A.  Burden of Proof

A proper characterization of the claim is essential because the framework for analyzing a FMLA claim differs depending on whether the plaintiff's claim is an "interference" claim or a "discrimination" claim.  When a plaintiff asserts interference with the FMLA or deprivation of an entitlement, the employee has only to show that he was entitled to benefits under the FMLA and was denied them.  29 U.S.C. §§ 2612(a), 2614(a).  Under this theory, the employee does not need to show that he was treated differently from others, and the employer cannot justify its decision by establishing a legitimate business purpose for its decision.  Callison, 430 F.3d at 119-20.

**NOT FOR PUBLICATION**

In contrast, where a plaintiff asserts a discrimination/retaliation claim, courts look to the legal framework established for Title VII claims.  Where there is indirect evidence of a violation of the FMLA, courts in the Third Circuit generally apply the McDonnell Douglas burden-shifting framework.  See, e.g., Parker v. Hahnemann Univ. Hospital, 234 F.Supp.2d 478 (D.N.J. 2002); Mieliwocki v. Univ. of Medicine and Dentistry of New Jersey, No. 03-780, 2006 WL 1876988 (D.N.J. July 5, 2006);  Coppa v. American Society for Testing Materials, No. 04-234, 2005 WL 1124180 (E.D. Pa. May 11, 2005); Holpp v. Integrated Comm'ns, Corp., No. 03-3383, 2005 WL 3479682 (D.N.J. Dec. 20, 2005).  Under this paradigm, a plaintiff must first establish a prima facie case of discrimination/retaliation by showing (1) she took FMLA leave, (2) she was subjected to an adverse employment action, and (3) there is a causal link between the leave and the adverse action.  See Coppa, 2005 WL 1124180 at *2 (citing Conoshenti, 364 F.3d 135).  If a plaintiff establishes her prima facie case, a rebuttable presumption of discrimination is created, and the burden shifts to the employer to articulate a legitimate non-discriminatory reason for the adverse employment action.  If the employer meets this burden of production, the plaintiff must show that the employer's proffered reason for the adverse action was a pretext for retaliating against the employee for taking FMLA leave.  Parker, 234 F.Supp.2d at 488-89 (D.N.J. 2002).

When there is direct evidence of retaliatory animus, however, the Third Circuit applies the Price Waterhouse framework.  As the Third Circuit explained in Conoshenti, when a FMLA plaintiff "alleging unlawful termination presents 'direct evidence' that his [FMLA leave] was a substantial factor in the decision to fire him, the burden of persuasion on the issue of causation shifts, and the employer must prove that it would have fired the plaintiff even if it had not

-10-

**NOT FOR PUBLICATION**

considered [the FMLA leave]." 364 F.3d at 147 (quoting Fakete v. Aetna 308 F.3d 335, 338 (3d Cir. 2002)). "Direct evidence" is defined as "evidence sufficient to allow the jury to find that the decision makers placed substantial negative reliance on the [the protected activity] in reaching their decision." Id. at 147 n.10 (quotations omitted). Under the Price Waterhouse framework articulated by O' Connor[2], the employer must convince the trier of fact that it is more likely than not that the decision would have been the same absent consideration of the illegitimate factor. Id. The employer must demonstrate that "with the illegitimate factor removed from the calculus, sufficient business reasons would have induced it to take the same position he or she would have occupied absent discrimination." Id. at 148.

Tamayo's FMLA claim is premised on her allegation that Deloitte Services based its decision to terminate her in substantial part on absences protected by the FMLA. In Conoshenti, the Third Circuit considered the plaintiff's claim that his FMLA leave was a factor in his employer's decision to terminate him and concluded that in such situations, liability is predicated on § 825.220(c) of the FMLA regulations. Id. at 147, n.9. Subsection 825.220(c) of the FMLA regulations provides:

> An employer is prohibited from discriminating against employees or prospective employees who have used FMLA leave. For example, if an employee on leave without pay would otherwise be entitled to full benefits (other than health benefits), the same benefits would be required to be provided to an employee on unpaid FMLA leave. By the same token, employers cannot use the taking of FMLA leave as a negative factor in employment actions, such as hiring,

---

[2]The Third Circuit has recognized that Justice O'Connor's concurring opinion in Price Waterhouse v. Hopkins, 490 U.S. 228 (1989), represents the Supreme Court's holding in the case. See Anderson v. Consol. Rail Corp., 297 F.3d 242, 248 (3d Cir. 2002).

-11-

**NOT FOR PUBLICATION**

> promotions or disciplinary actions; nor can FMLA leave be counted under "no fault" attendance policies.

29 C.F.R. § 825.220(c) (emphasis added). Subsection 825.220(c) implements § 2615(a) of the statute, which makes it illegal to interfere with, restrain, or deny any lawful FMLA right. However, the Third Circuit has concluded that although "29 C.F.R. § 825.220(c) appears to be an implementation of the 'interference' provisions of the FMLA, its text unambiguously speaks in terms of 'discrimination' and 'retaliation,' and we shall, of course, apply it in a manner consistent with that text." Conoshenti, 364 F.3d at 147, n.9; see also Callison, 430 F.3d at 119 (stating that the FMLA provides protection against discrimination by prohibiting employers from using "the taking of FMLA leave as a negative factor in employment actions. . . 29 C.F.R. § 825.220(c)"). Accordingly, this Court finds that Tamayo's claim that Deloitte Services used her absences to care for her mother as a "negative factor" in reaching its decision to terminate should be and is characterized as a retaliation claim and will be analyzed as such.[3]

Defendant asks this Court to apply the McDonnell Douglas burden-shifting framework. In contrast, Plaintiff maintains that if the Court treats the claim as a retaliation claim, the Price Waterhouse standard is more appropriate. As discussed above, the McDonnell Douglas analysis is used when there is indirect, circumstantial evidence of discrimination whereas the Price

---

[3] Plaintiff relies on Bachelder v. America West Airlines, Inc., a Ninth Circuit case that held that an employer's consideration of FLMA-protected leave as a negative factor in an employment decision is an interference with the FMLA, not a retaliation claim. 259 F.3d 1112, 1125 (9th Cir. 2001). Plaintiff seeks to characterize her claim as interference in order to avoid the burden shifting framework of McDonnell Douglas or the Price Waterhouse analysis. However, this Court is bound by Conoshenti, wherein the Third Circuit considered Balchelder yet interpreted 29 C.F.R. § 825.220(c) to relate to discrimination or retaliation claims.

**NOT FOR PUBLICATION**

Waterhouse standard is used when there is "direct evidence" of discrimination.  See Fakete, 308 F.3d at 337-338 (explaining the use of the two standards and applying "direct evidence" analysis in the context of an ADEA claim).

  In support of her claim that Deloitte Services used her FMLA protected absences as a negative factor in its decision to terminate her, Tamayo points to Richter's memo from the July 31, 2003 meeting.  The memo makes frequent reference to Tamayo's attendance and absences over the preceding months and describes "issues around attendance" as a "significant concern."  The memo further asserts that Tamayo "has not been living up to the PIP. . . she has been absent multiple times in the past few months."  The memo also states that Richter told Tamayo that "due to her absences she was not doing the essential parts of her job, and this was unacceptable, and had to change."  Later that same day, Richter and Cahn decided to terminate Tamayo based on two concerns raised in their memo: 1) attendance and 2) time reporting.  Plaintiff argues that Defendant necessarily considered her FMLA-protected absences in its decision to fire her because Defendant failed to designate which of her absences were protected by the FMLA and which were not.  Plaintiff notes, for example, that the July 8, 2003 memo tracking Plaintiff's attendance from April through early June did not identify which absences were protected by the FMLA.  Nor was Plaintiff asked at the July 31, 2003 meeting to specifically indicate which of her absences resulted from caring for her mother.  Plaintiff argues that since Defendant did not separate her FMLA absences from any other non-protected absences, it cannot contend that it did not consider her FMLA-protected absences when it decided to terminate her.

  The Court finds that Tamayo has not presented sufficient direct evidence of a retaliatory

**NOT FOR PUBLICATION**

animus to bring her claim within the ambit of Price Waterhouse. Unlike Conoshenti, where the plaintiff presented documents that specifically assigned as the reason for plaintiff's discharge absences that were potentially FMLA qualified, the evidence in this case is more circumstantial. General statements made by Cahn and Richter regarding Tamayo's attendance and performance problems, in light of the fact that she had a prior history of attendance issues and allegedly missed a number of days unrelated to her mother's illness, do not unambiguously reflect a retaliatory animus to terminate Tamayo for taking leave to care for her mother. Likewise, that Defendant failed to properly document which absences were FMLA-qualified is not sufficient evidence "to allow the jury to find that the decision makers placed substantial negative reliance on the [the protected activity] in reaching their decision." Fakete, 308 F.3d at 338 (3d Cir. 2002) (quotations omitted). Thus, the Court will apply the McDonnell Douglas burden shifting framework.

### B.  McDonnell Douglas Analysis of the Retaliation Claim

Defendant concedes that Plaintiff has met the first two elements of her prima facie case. However, Defendant argues that Plaintiff is unable to establish the existence of a causal connection between her FMLA-protected absences and her termination.[4] To illustrate a "causal link" for the purposes of establishing retaliation, a plaintiff may rely on a broad array of evidence, including, but not limited to, temporal proximity and evidence of ongoing antagonism. Farrell v. Planters Lifesavers Co., 206 F.3d 271, 283-84 (3d Cir. 2000). As the Third Circuit

---

[4] For the purposes of this motion only, Defendant has conceded that Plaintiff was an eligible employee and that her absences to care for her mother were protected by the FMLA.

-14-

**NOT FOR PUBLICATION**

stated, "[a]lthough timing and ongoing antagonism have often been the basis for the causal link, our case law clearly has allowed a plaintiff to substantiate a causal connection for the purposes of the prima facie case through other types of circumstantial evidence to support that inference." Id. at 280-81.  Here, the Court finds the timing to be "unduly suggestive."  See Parker, 234 F.Supp.2d at 492 (finding causation where plaintiff's position was eliminated one week before she was to return from FMLA leave).  Defendant fired Plaintiff while she was in the midst of caring for her sick mother and specifically pointed to her absences as one of two primary reasons for terminating her.  Many of the cited absences occurred during the period that her mother was ill.  At the July 31, 2003 meeting, Richter allegedly said that she thought Tamayo was using her mother "as an excuse" for her absences.  It is not clear from the Record that Defendant solely considered unprotected absences when making its decision to fire her.     When Tamayo indicated that she was going to continue to need to miss intermittent days to take her mother to have blood transfusions, Richter mentioned that Tamayo may be eligible for FMLA leave.  Defendant had not previously informed Plaintiff of its FMLA policies despite learning of Tamayo's mother's serious health condition.  Tamayo expressed interest in learning more about the FMLA and inquired how to apply for it.  After the meeting, she contacted PSN to request the appropriate forms.  However, her efforts were futile because following the meeting, Cahn and Richter decided to fire her.  Considering the evidence as a whole, the Court finds that a reasonable jury could conclude that Tamayo has made out a prima facie case of retaliation. Plaintiff has presented sufficient evidence to find the required inference of a causal connection.

Defendant argues that even if the Court finds that Plaintiff can establish a prima facie

**NOT FOR PUBLICATION**

case of retaliation, Deloitte Services has presented legitimate, non-discriminatory reasons for terminating Tamayo. Defendant has introduced evidence that Tamayo's attendance problems began well before her mother's illness. Tamayo's April PIP formally advised her that her habit of working from home was "not in sync with the ultimate goals of the R&A team," resulting in a perception that she was never around. The PIP required her to work a standard, eight hour day in the office, with unplanned changes "limited only to extreme circumstances." The PIP further stated that "[f]ailure to show immediate, significant and sustained improvement will result in further performance improvement action, up to an including termination." Defendant refers to absences by Tamayo that preceded her informing Deloitte Services about her mother's condition, specifically late arrivals on May 7 & 8 and absences on May 9, 20, and 23. The Court notes that there is dispute regarding these absences as Plaintiff claims that she did not miss any of these days. There is also a dispute about Tamayo's alleged absences in July for reasons unrelated to her mother. Contrary to Defendant's allegations, Plaintiff claims that her only unprotected absence was to visit the dentist.

Despite these questions of fact, Defendant argues that it had an undisputed, independent basis for terminating Tamayo because she had been falsifying her time reports. At the July 31, 2003 meeting, Tamayo admitted logging eight hours of work for days when she had either not worked a full day or had not worked at all. Falsification of time records was a violation of Deloitte Services' Time Reporting policy and the Deloitte Services Code of Conduct and Professional Ethics. Although Tamayo's non-FMLA protected absences present questions of fact best resolved by a fact-finder, the Court finds that the falsification of time records suffices as a

**NOT FOR PUBLICATION**

legitimate, independent employment reason for terminating Tamayo.

The burden shifts to Plaintiff to show that the legitimate reason given was a pretext for actual retaliation. Here, the Court finds that there is an issue of material fact regarding whether Defendant's proffered reasons for terminating Plaintiff were pretextual. Defendant cites both absenteeism and falsification of time records as grounds for termination. As previously discussed, there is an issue of material fact whether Defendant considered Tamayo's FMLA-protected absences in deciding to terminate her. There is likewise an issue of material fact regarding the number of non-FMLA protected absences Tamayo took and whether these absences violated her PIP. Furthermore, Tamayo challenges whether Defendant would have terminated Plaintiff for falsifying time records, without more. Defendant has presented no evidence that this was standard procedure or that it has ever fired someone for a similar offense.

Accordingly, the Court denies both motions for summary judgment and will allow the factfinder an opportunity to determine the actual motivation for Defendant's actions.

**2. New Jersey Family Leave Act (Count 2)**

The elements of a retaliatory discharge claim under the NJFLA are coextensive with those under the FMLA. See DePalma v. Building Inspection Underwriters, 350 N.J. Super. 195, 213-14 (App. Div. 2002) (explaining that NJFLA retaliatory discharge claim follows the McDonnell Douglas burden shifting approach); see also Tucker v. County of Monmouth, 159 Fed. Appx. 405, 408 (3d Cir. 2005) (relying on its FMLA analysis as determinative of its NJFLA holding). Accordingly, for the reasons discussed, both parties' motions for summary judgment

**NOT FOR PUBLICATION**

are denied on Tamayo's NJFLA claim.

### 3. Liquidated Damages

Since the Court denies Plaintiff's motion for summary judgment, her motion for liquidated damages is also denied.

**CONCLUSION**

The Court denies both Plaintiff's and Defendant's motions for summary judgment. An appropriate Order will follow.

**s/ William H. Walls, U.S.D.J.**

.